Sue Ellen Tatter
Assistant Federal Defender
FEDERAL PUBLIC DEFENDER
FOR THE DISTRICT OF ALASKA
601 West Fifth Avenue, Suite 800
Anchorage, Alaska  99501
(907) 646-3400

Attorney for Defendant

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ALASKA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>vs.<br><br>PAUL GENE ROCKWOOD, JR.,<br><br>Defendant. | NO. 3:10-cr-00061-RRB<br><br>**SENTENCING MEMORANDUM OF THE DEFENSE** |

The defendant, PAUL GENE ROCKWOOD, JR., through counsel, presents this memorandum for sentencing August 23, 2010.

## I.     INTRODUCTION

Paul Rockwood was a weatherman in the Navy and then in King Salmon, Alaska.  This work was often computer-related.  He had a lot of "down time" in front of the computer as well, and also used  personal computers.  He accessed Islamic web sites, including those relating to the radical cleric Anwar al-Awlaki.

When he left King Salmon for medical appointments or household shopping, Mr. Rockwood attended the Anchorage mosque as a convert to Islam. He made friends with an undercover state trooper who pretended to be interested in Islam and jihad. The two of them spent many recorded hours talking about the Middle East, the Koran, the relationship of Israel and Palestine, the various American war actions in the Middle East and Afghanistan, injustices perpetrated on Muslim people and methods of avenging these injustices. The recordings constitute the bulk of the government's investigatory materials in this case.

This relationship with the trooper was important to Mr. Rockwood who felt isolated and lonely in King Salmon. Mr. Rockwood was eager to engage in dramatic conversations and meetings with the trooper, who paid for meals, hotel rooms, cell phones, a GPS device and other items. During these meetings, Mr. Rockwood characterized himself to the trooper as "flamboyant." (PSR ¶ 11) The relationship clearly was fed by the trooper's interest in Mr. Rockwood and the drama created by their discussions.

Mr. Rockwood suffers from Meniere's disease which is a condition of the inner ear producing dizziness, nausea and hearing loss. In addition, Mr. Rockwood became addicted to opiate painkillers and was being treated for this problem in early 2010, during the period of his relationship with the trooper. Because the Meniere's disease made his King Salmon shift work difficult, Mr. Rockwood terminated his job at the weather service for medical reasons in May 2010.

On May 19, 2010, the Rockwood family flew to Anchorage on the first leg of a planned move from King Salmon to Boston and then England, where Mrs. Rockwood planned to give birth to the couple's second child. Federal agents confronted Mr. Rockwood at the Anchorage Airport. They videotaped the interview. During the interview, agents presented him with the actual list of offenders against Muslim people. Mr. Rockwood had compiled this paper from bits and pieces of Internet information. At the trooper's request, Mr. Rockwood had given this list to his wife to deliver to the trooper in Anchorage. When federal agents showed him the list – which they obviously obtained from the undercover trooper – Mr. Rockwood stated: "I'm surprised he [the Trooper Sgt.] compiled this..." Mr. Rockwood did not admit that he himself compiled the list.

This conduct forms the basis for the charged conduct, lying to a federal officer in violation of 18 U.S.C. § 1001. Mr. Rockwood entered into a plea agreement in which he admitted to the charged conduct and agreed to serve the maximum sentence for this offense, eight years. The main impetus for his part of the agreement was to help his wife avoid jail and be allowed to deliver the couple's second child in England.

II.     "ALL TALK AND NO ACTION"

All of Mr. Rockwood's behavior with the state trooper was talk or paperwork. None of Mr. Rockwood's close associates, including his father, his wife and friends in King Salmon, believed he was capable of planned violence. (E.g., PSR ¶ 65.) The sketch of a "circuit" and the list of people and organizations who had injured Islam were primitive snippets of material from the web and elsewhere. At one point, the trooper asked Mr.

Rockwood to check out the Northern Air Cargo facility for security in contemplation of transportation of non-existent explosives (which the pair hoped they might get from a mining executive introduced by the trooper). The trooper asked Mr. Rockwood to e-mail photos of the installation. Mr. Rockwood actually did not conduct this surveillance or send e-mail photos. He just put the trooper's requests on hold, and pretended he was complying with the requests.

Mr. Rockwood is extremely unsophisticated mechanically and has never been focused or committed to a plan of action. In fact, Mr. Rockwood is soft-hearted and extremely committed to his family, particularly his four-year-old son. When counsel and Mr. Rockwood witnessed a June 1 plane crash in Fairview, which took the life of a four year old, Mr. Rockwood became very emotional and stated, "That could be my son..." In other words, he is an empathetic person. Although he could talk with a male companion endlessly about ideas involving violence, he does not appear to have the commitment or anti-social impulses to carry out the concepts.

It is true that Mr. Rockwood has a prior assault from 2005 in Minnesota. However, this assault involved alcohol, and occurred before Mr. Rockwood's serious interest in Islam. As his father noted, Mr. Rockwood's Islamic faith encouraged him to avoid alcohol and become more stable.

## III. SENTENCING ISSUES

### A. The Sentencing Guidelines

No party objected to the guideline computation in the draft presentence report. This computation places Mr. Rockwood in offense level 29 and criminal history category VI. This high computation results from a double enhancement for "terrorism" related conduct described in ¶¶ 43 and 45 of the PSR. These enhancements apply even though the crime charged in a non-violent one – false statement to a government agent. Also, Mr. Rockwood is actually in criminal history category I with a single point. However, because Mr. Rockwood faces another enhancement in criminal history (for the "terrorism" label), the guidelines place him in category VI.

Thus the guidelines, as technically and correctly applied, work in an extremely harsh way in this case. However, the statutory maximum over-rides the guidelines in this case.

### B. Statutory Objectives

The controlling statute, 18 U.S.C. § 3553(a), requires this court to sentence Mr. Rockwood to a term "sufficient, but not greater than necessary" to achieve certain objectives. Those objectives are (1) promoting respect for the law, (2) deterring criminal conduct, (3) protecting the public, and (4) rehabilitation. The court must consider the offense and the offender, the sentencing guidelines, and the kinds of sentences available.

An eight-year term is this case is an extremely substantial sentence, particularly in a case involving no overt conduct or violence. The lengthy term essentially recognizes the statutory interest in preventing or punishing risks to the public safety. The

message is that use of words, with a risk of future harm, results in substantial punishment. The lengthy term also will deter others who may be tempted to act upon Internet-fueled fantasies and interests. In separating Mr. Rockwood from his wife and children, whom he loves, the sentence will deter future unwise and unreasonable conduct on his part, and encourage rehabilitative thoughts on how to live better in the future.

### IV.  CONCLUSION – DEFENSE REQUESTS

The defense respectfully requests the court to accept the plea bargain. Mr. Rockwood agreed to a sentence which is the maximum for the offense charged. This sentence was chosen despite the fact that Mr. Rockwood engaged in no physical conduct nor completed any of his inchoate, hypothetical ideas. He agreed to the lengthy sentence largely to assure that his wife would serve no jail time and that she and their child would be able to travel to England and prepare there for the birth of a second child in November.

The defense requests that this court make the following recommendations to the federal Bureau of Prisons: (1) prison placement in the Northeast, (2) placement in a facility where Mr. Rockwood's Meniere's disease can be monitored and treated and (3) placement in a facility which offers the residential Drug and Alcohol (RDAP) program.

DATED this 16th day of August 2010.

    Respectfully submitted,

    /s/Sue Ellen Tatter
    Assistant Federal Defender
    601 West Fifth Avenue, Suite 800
    Anchorage, AK 99501
    Phone: 907-646-3400
    Fax: 907-646-3480
    E-Mail: sue_ellen_tatter@fd.org

    /s/M.J. Haden
    Assistant Federal Defender
    601 West Fifth Avenue, Suite 800
    Anchorage, AK 99501
    Phone: 907-646-3400
    Fax: 907-646-3480
    E-Mail: mj_haden@fd.org

Certification:
I certify that on August 16, 2010,
a copy of the ***Sentencing Memorandum of the Defense*** was served electronically on:

Bryan D. Schroder
Assistant U.S. Attorney
222 West 7th Avenue, #9
Anchorage, AK 99513
E-Mail: bryan.schroder@usdoj.gov

Steven E Skrocki
Assistant U.S. Attorney
222 West 7th Avenue, #9
Anchorage, AK 99513
E-Mail: steven.skrocki@usdoj.gov

and a copy was hand delivered to:

U.S. Probation & Pretrial Services
222 W. 7th Avenue, #48, Room 168
Anchorage, AK 99513-7562

/s/Sue Ellen Tatter